Barbara Y. JAUDON, Plaintiff,

v.

ELDER HEALTH, INC.
et al., Defendants.

No. Civ.A. CCB–99–3149.

United States District Court,
D. Maryland.

Dec. 19, 2000.

Jeffrey J. Plum, Law Offices of Jeffrey J. Plum, PA, Bel Air, MD, for Barbara Y. Jaudon.

Russell H. Gardner, Laura Anne Giantris, Piper Marbury Rudnick & Wolfe, LLP, Baltimore, MD, for Elderhealth, Inc., Regi Amos.

## MEMORANDUM

GESNER, United States Magistrate Judge.

Plaintiff, Barbara Jaudon, brought this action against her former employer, Elder Health, Inc., and its agents, for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and for various alleged violations of state law. Plaintiff claims, *inter alia*, that Elder Health unlawfully subjected her to sexual harassment and then fired her in retaliation for her complaints about the sexual harassment. (Paper No. 2 at Counts I & II). Plaintiff seeks compensatory and punitive damages as well as interest, costs, and attorney's fees. (*Id.*).

The case was referred to the undersigned for all proceedings with the consent of the parties. 28 U.S.C. § 636(c); Local Rule 301.4. Before the court are Defendants' Motion for Summary Judgment, (Paper No. 37), Plaintiff's Response, (Paper No. 38), and Defendants' Reply, (Paper No. 39). In her Response, plaintiff concedes all of her remaining claims against Mr. Amos. (Paper No. 38). Accordingly, judgment shall be entered for Mr. Amos on all claims against him. Plaintiff also concedes all claims against Elder Health except those asserted under Title VII. (*Id.*). Therefore, judgment shall be entered for Elder Health on the non-Title VII claims.

On November 27, 2000, the court held a hearing on defendant's motion. At the court's request, the parties both submitted supplemental briefs on issues discussed at the hearing. (Paper Nos. 42 and 43). Defense counsel also submitted the transcripts of the depositions of Mary Jane Harris and Regi Amos in response to a request from the court. (Paper Nos. 44 and 45).

For the reasons set forth below, the court grants Elder Health's motion for summary judgment on plaintiff's sexual harassment claim and denies Elder Health's motion on plaintiff's retaliation claim.

## I. *Factual Background*

Elder Health, a geriatric health care provider, hired plaintiff on September 22, 1997 to work as a van driver. (Paper No. 37, Exhs. 1, 3). During the term of plaintiff's employment, Regi Amos served as "Transportation Coordinator" at Elder Health. (*Id.* at Exh. 3). In particular, Mr. Amos interviewed, trained, counseled, tested, scheduled, and disciplined drivers. (*Id.*, Exh. 2 at ¶ 5, Paper No. 38, Exh. 3 at 16–21). Mr. Amos could not directly "hire, fire, promote, demote, transfer, or determine the rate of pay of any Elder Health employee." (Paper No. 37, Exh. 2 at ¶ 5). Mr. Amos did make recommendations concerning the hiring of drivers, (Paper No. 38, Exh. 3 at 20–21),[1] and he reported driver misconduct to the Director of Human Resources, Mary Jane Harris. (Paper No. 44 at 24, 113–114). As discussed in greater detail below, the parties dispute whether Mr. Amos had authority to make recommendations regarding termination of drivers.

Elder Health maintains a policy against sexual harassment and an open-door policy, (Paper No. 37, Exh. 5), which plaintiff learned about when she was hired. (*Id.*, Exh. 7). The sexual harassment policy

---

1. Indeed, it appears that Mr. Amos may have been the only individual who interviewed plaintiff for her job. (Paper No. 38, Exh. 3 at 21).

provides, in part, that "[a]nyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment." (*Id.*, Exh. 5). This policy provides for a range of disciplinary action "depending on, among other things, the severity of the offense, the circumstances under which it occurred, your responsibilities, your length of service (seniority) with Elder Health, and your overall work record, including any prior misconduct." (*Id.*). The open-door policy recognizes that "there are circumstances in which speaking with someone [other than an immediate supervisor] might be necessary. In these cases you are always welcome to stop in and talk to the CEO or the Human Resources Manager." (*Id.*).

Sometime in late October or early November 1997, plaintiff reported to Ms. Harris that Mr. Amos had followed plaintiff into the women's restroom at work and looked over the door of the stall at plaintiff after she started undressing. (Paper No. 37, Exh. 4 at 89–91; Paper No. 38, Exh. 1 at 3). Plaintiff also charged that Mr. Amos had previously made offensive sexual comments to her on several occasions and touched her inappropriately on two occasions. (Paper No. 37, Exh. 4 at 72–74, 79–87).

In response to plaintiff's complaint, Ms. Harris conducted an investigation during which she interviewed plaintiff and Mr. Amos, as well as two other individuals. (Paper No. 44, Exh. 2). Ms. Harris offered plaintiff an opportunity to transfer to another facility if plaintiff felt uncomfortable working with Mr. Amos, which plaintiff declined. (Paper No. 37, Exh. 4 at 237–38).

On November 26, 1997, Ms. Harris issued Mr. Amos a written "formal warning" which stated, in part, that "[a]ny repeat offense of this nature or any harassing nature will result in immediate termination." (*Id.*, Exh. 13). Ms. Harris further advised Mr. Amos not to treat plaintiff differently from any other driver. (*Id.*,

Exh. 10 at 61, Exh. 11 at 141–42, 157). The parties agree that Mr. Amos did not engage in any sexual misconduct towards, or sexual harassment of, plaintiff following this formal warning.

Plaintiff contends that, subsequent to her meeting with Ms. Harris, Mr. Amos began unfairly criticizing her work in retaliation for her sexual harassment complaint. (*Id.*, Exh. 9 at 3–4). In particular, plaintiff alleges three incidents in which Mr. Amos took issue with her driving or treatment of Elder Health's clients. (*Id.*). Plaintiff maintains that she told Mr. Amos that he should file a formal complaint against her or stop criticizing her work. (*Id.* at 4). Plaintiff asserts that she complained to Janice Melton, the Center Administrator, that Mr. Amos was retaliating against her, but that Ms. Melton "indicated there was nothing she could do without some proof." (*Id.*). Elder Health never took any disciplinary action against plaintiff in connection with Mr. Amos' alleged complaints. (Paper No. 37 at 8).

On December 31, 1997, Elder Health sent a memorandum entitled "Mandatory Transportation Training" to all van drivers at plaintiff's facility advising them of a traffic safety meeting on January 21, 1998 at 4:30 p.m. (Paper No. 38 at Exh. 12). The memorandum also advised the drivers of an all day seminar on Saturday, January 24, 1998. (*Id.*). The memorandum noted with respect to the January 24 seminar that "[a]ttendance is imperative" and stated, "please make all necessary arrangements to enable you to attend." (*Id.*).

The parties', version of events surrounding the January 21, 1998 meeting differs greatly. The court will summarize plaintiff's version of events first and then the defendant's account. According to plaintiff, on the morning of January 21, 1998, Mr. Amos called her at home asking if she could work that day even though she was not scheduled to work. (*Id.*, Exh. 2 at 245–46). Plaintiff agreed, but she reportedly told Mr. Amos that she could not stay

late because she needed to pick up her nephew. (*Id.* at 182–83). Plaintiff explained to Mr. Amos that the "babysitter was having problems with [plaintiff] getting there late" because Mr. Amos had required plaintiff to work late on prior occasions. (*Id.*). Plaintiff also told Mr. Amos that she "couldn't afford to lose the babysitter." (*Id.*).

At approximately 4:30 p.m. on January 21, Mr. Amos called plaintiff while she was working and advised her to "hurry up and get back" to Elder Health for the scheduled meeting. (*Id.*). Plaintiff acknowledges forgetting about the meeting. (*Id.*). During the call, plaintiff reminded Mr. Amos that she had to pick up her nephew and asked what time the meeting would start. (*Id.*). Mr. Amos replied that the meeting was starting at 4:30 p.m. (*Id.*). Plaintiff returned to Elder Health within ten minutes; the meeting started approximately fifteen minutes late at 4:45 p.m. (*Id.*). At approximately 5:15 p.m., plaintiff reminded Mr. Amos that she had to leave to pick up her nephew. (*Id.* at 180, 184).

Plaintiff described the exchange that occurred thereafter between her and Mr. Amos as follows:

Q  ... What did Mr. Amos say in response to what you just said?

A  He said he didn't want me to go.

Q  Anything else?

A  He said he went to a lot of trouble to prepare that fucking food and how could I be so ungrateful. And I said, I'm not being ungrateful, I just need to go get the baby. And I said, not only that, you didn't let me go to lunch until around three o'clock, so I said I'm not even hungry. But I said, that's not the point, I need to get to the babysitter.

Q  Now when you—was there anything else said at that, that time?

A  No. About that time—this is about five-twenty, about this time—and I got up to walk to the front door, and then he came behind me, and he

said, I was going to ask you for a ride across town, anyway; you mean to tell me you can't wait to give me a ride? I said, I told you I can't give you a ride, I'm not going to give you a ride, I need to get to the babysitter. He said, I went to all this fucking trouble to get you all this food. Do you know how hard it is to get something in here? You know they don't give a shit about you, meaning the drivers. So I said, whatever, Regi.

And by that time, the security guard was coming in the front door and two other drivers from Pratt Street, so I asked the security guard, Tim, I said, could you walk me to my car?

(*Id.* at 180–82). Plaintiff also testified that Mr. Amos was "really loud. I mean, because he was really like in my face, because I was like pushing him back and I was like, look, I got to go." (*Id.* at 184–85).

According to plaintiff, as she was leaving, the speaker indicated that he would "bring this to a close because I know you all want to get back there to the food." (*Id.* at 189). Plaintiff testified that she actually left the building between 5:25 and 5:30 p.m. (*Id.* at 188).

Mr. Amos reports the events of January 21 quite differently. According to Mr. Amos, plaintiff first informed him of her child care problem as she prepared to leave the meeting. (Paper No. 45 at 174). Mr. Amos testified that he was "positive" that plaintiff did not tell him fifteen minutes before she left. (*Id.*). Plaintiff also reportedly told Mr. Amos that "she didn't like it here, she was bored." (*Id.*). Mr. Amos testified that the speaker was not "winding down" at 5:15 p.m., but Mr. Amos could not recall when the meeting actually ended. (*Id.* at 180).

According to Mr. Amos, he left the meeting at the same time as plaintiff for the purpose of reporting plaintiff to Ms. Harris. (*Id.* at 181). Mr. Amos maintains that he did not follow plaintiff because he did not want to get into a confrontation.

(*Id.* at 181). Rather, he testified "I went in one direction, she went in another." (*Id.*). Mr. Amos denied cursing at plaintiff. (*Id.* at 181–82).

After he left the meeting, Mr. Amos testified that he called Ms. Harris to inform her of "everything that was said." (*Id.* at 184). According to Mr. Amos, Ms. Harris directed him to prepare a disciplinary action form. (*Id.*).[2] On the form, Mr. Amos described the facts surrounding the meeting as follows:

> While at the Traffic Safety Training on January 21, 1998 at 5:00 p.m. you said to me that you were leaving at 5:15 p.m. I then said to you that you needed to stay for the training, and that it was mandatory for all of transportation. You then stated that you had to pick-up your son and that you were going to leave. I then reminded you that you were aware of this training well in advance and that you should have made some arrangement, also I told you that I would not argue about this with you. At 5:15 p.m. you then got-up and left.

(Paper No. 37, Exh. 15). The form also contains a checked box indicating "Recommendation for Discharge." (*Id.*). Just below, there appears a line with Ms. Harris' signature indicating "HR Manager Approval." (*Id.*). The record does not reflect who checked this box. According to Mr. Amos, he did not make any recommendations to Ms. Harris regarding plaintiff's conduct. (Paper No. 45 at 187). On the other hand, Ms. Harris testified that all writing on the form was Mr. Amos' except for her signature. (Paper No. 44 at 113).

Mr. Amos reports that he faxed the disciplinary action form to Ms. Harris that evening. (Paper No. 45 at 185). The details regarding the decision to fire the plaintiff and the communication of the firing to plaintiff are very vague. Ms. Harris testified in her deposition that she had no recollection of her discussions with Mr. Amos regarding the events of January 21st or the decision to fire plaintiff. (Paper No. 44 at 109–121). Regarding the decision to terminate plaintiff, Ms. Harris testified at her deposition as follows:

Q  Did you make the decision to terminate?

A  I would make the final decision.

Q  Who else participated in the decision to terminate Barbara Jaudon?

A  I cannot recall.

Q  Regi Amos didn't have any involvement in that, did he?

A  No, he would not.

(*Id.* at 109–10). Ms. Harris went on to testify that she could not recall anyone who may have had input into the decision other than "records and legal counsel." (*Id.* at 111).

Plaintiff reports that when she got home on the evening of January 21, she paged Janice Melton, the center's administrator, and when Ms. Melton called back later that evening, she told plaintiff "I believe Regi called Mary Jane [Harris], and Mary Jane told me to terminate you." (Paper No. 37, Exh. 4 at 185, 198). It is undisputed that Ms. Harris did not talk to plaintiff prior to Ms. Melton communicating plaintiff's termination to plaintiff. (*Id.* at 185).

## II. *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue of material fact and a decision may be rendered as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden to demonstrate the absence of any genuine issue of material fact. Fed.R.Civ.P. 56(c); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

---

**2.** As discussed in greater detail below, Ms. Harris has virtually no recollection of her conversation with Mr. Amos, including the direction to him to prepare this form. (Paper No. 44 at 116–17).

If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The only facts that are properly considered "material" are those that might affect the outcome of the case under the governing law. *Id.* at 248, 106 S.Ct. 2505. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. 2505. Thus, the existence of only a "scintilla of evidence," is not enough to defeat a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

To determine whether a genuine issue of material fact exists, all facts and all reasonable inferences drawn therefrom are construed in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party, however, may not rest on its pleadings but must show that specific, material facts exist to create a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with an affidavit or otherwise admissible evidence. *Id.;* Fed.R.Civ.P. 56(c); *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof in her claim at trial."). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

While courts must be particularly careful when considering a motion for summary judgment in a discrimination case because motive is often the most important issue, summary judgment remains appropriate if the plaintiff cannot prevail as a matter of law. *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). On the other hand, if the record as a whole establishes that a jury reasonably could return a verdict for the plaintiff, then a genuine factual dispute exists and summary judgment is not appropriate. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### III. *Discussion*

#### A. *Sexual Harassment Claim*

■ Plaintiff claims that she was subjected to hostile environment sexual harassment. (Paper No. 2, Counts I & II). In order to establish such a claim, the employee must show "(1) that she was harassed 'because of' her 'sex'; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 241 (4th Cir.2000). For purposes of the pending motion, the parties do not dispute the first three elements. The dispute centers on the fourth element, that is, whether there is a basis for imputing liability to Elder Health.

#### 1. *Employer's Liability*

■ There are two theories for establishing employer liability, each of which depends upon the harasser's level of authority. The first theory applies to those cases where the harassment is committed by an individual with supervisory authority over the plaintiff. In those cases, the Supreme Court has instructed that courts should use an "agency aided" theory, that is, that the employer may be liable when a supervisor is "aided in accomplishing their

tortious objective by the existence of the agency relation." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). If the supervisor is so aided, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 765, 118 S.Ct. 2257; *Faragher v. City of Boca Raton,* 524 U.S. 775, 803, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ The second theory of employers' vicarious liability applies to those cases where co-workers commit harassment. In those cases, courts instead apply a negligence theory. *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999); *see also Silk v. City of Chicago et al.,* 194 F.3d 788, 804 (7th Cir.1999). Under the negligence theory, the employer is directly liable for failing "after, actual or constructive notice, to take prompt and adequate action to stop [the harassment]." *Mikels,* 183 F.3d at 332.

In this case, the court concludes that the proper analysis of Elder Health's liability is under the "agency aided" theory because, viewing the evidence in the light most favorable to plaintiff, Mr. Amos clearly had some level of supervisory authority over her. At a minimum, Mr. Amos had the authority to interview, train, counsel, test, schedule and discipline drivers. As a result, the negligence theory applicable to coworkers is not the appropriate analysis here.[3] Before addressing whether Mr. Amos' conduct was aided by the agency relationship, the court must determine whether the alleged harassment culminated in a tangible employment action.

### 2. *Tangible Employment Action*

■ As a preliminary matter, if the harassment "culminated in a tangible employment action," such as termination, the employer's absolute vicarious liability is established without the need to determine, as a factual matter, whether the harasser was aided by the agency relationship. *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Mikels,* 183 F.3d at 332. Defendant argues that its liability is not automatic because no tangible employment action resulted from the harassment. Plaintiff responds that Mr. Amos' alleged sexual harassment culminated in her firing, thereby establishing a conclusive basis for imputing liability. (Paper No. 38 at 7–13). For the following reasons, the court concludes that there is insufficient evidence to establish that the alleged harassment by Mr. Amos resulted in plaintiff's termination.

■ In order to establish that the harassment "culminated" in a tangible employment action, plaintiff must establish a causal connection between the harassment and the action. *See Johnson v. West,* 218 F.3d 725, 731 (7th Cir.2000) (recognizing causation requirement implicit in question whether harassment culminates in tangible employment action); *Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 956 (9th Cir.1999) (same); *Fierro v. Saks Fifth Avenue et al.,* 13 F.Supp.2d 481, 491 (S.D.N.Y.1998) (same). Intervening circumstances may serve to break the causal connection between the two.

■ Here, while the record contains evidence of both Mr. Amos' harassment and plaintiff's firing, there are significant intervening circumstances. In particular, plaintiff invoked company policy and complained of sexual harassment by Mr. Amos. (Paper No. 37, Exh. 9 at 3). Thereafter, an investigation of plaintiff's allegations was conducted, and Mr. Amos received a formal reprimand. (Paper No. 37, Exh. 9 at 3; Paper No. 45, Exh. 2; Paper No. 38 at Exh. 13). Perhaps, most impor-

---

3. It is clear that plaintiff could not prevail on a negligence theory inasmuch as it is undisputed that Elder Health took prompt and effective remedial action once plaintiff complained of the alleged harassment.

tantly, plaintiff concedes that Mr. Amos' sexual harassment stopped following his reprimand. *Cf. Spicer v. Commonwealth of Virginia et al.,* 66 F.3d 705, 710 (4th Cir.1995) (en banc) (no liability where plaintiff conceded that harassment stopped). In the court's view, these significant, intervening circumstances serve to break the causal connection between the alleged harassment by Mr. Amos and the eventual termination of plaintiff. Consequently, plaintiff cannot establish that Mr. Amos' sexual harassment "culminated" in her firing.[4]

### 3. *"Agency–Aided" Analysis*

Because no tangible employment action resulted from the harassment, in order to impute liability to Elder Health, plaintiff must establish that the agency relationship aided Mr. Amos' alleged harassment. Elder Health maintains that Mr. Amos' conduct was not aided by the "agency relation." (Paper No. 37 at 16–19). For the following reasons, the court concludes that there is insufficient evidence establishing that the agency relationship aided Mr. Amos' alleged harassment to create a genuine issue of material fact.

■ The Fourth Circuit has recognized that not all harassment "even by 'supervisory' employees necessarily qualifies under the 'malleable terminology' of this standard." *Mikels,* 183 F.3d at 333. The details of the relationships and the particular circumstances must be examined. *Id.* To establish the "agency aided" theory, a plaintiff must show that the "employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a co-worker would not." *Id.* (citing *Faragher,* 524 U.S. at 803, 118 S.Ct. 2275).

The *Mikels* court instructed that "the most powerful indicator of such a threat-

induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in a particular situation, to take tangible employment actions against the victim such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* In this case, there is no evidence that Mr. Amos possessed this "most threatening form of supervisory authority." *Id.* While plaintiff maintained in its opposition to defendant's motion for summary judgment that Mr. Amos had such authority, plaintiff has not offered any evidence of this claim and, indeed, plaintiff conceded at the motions hearing held in this case that Mr. Amos did not have such authority.

Moreover, while the evidence establishes that Mr. Amos had some level of supervisory authority over plaintiff, there is no evidence of record that any actions he could take by himself would cause an employee to have "significantly different responsibilities" or a "significant change in benefits." *Mikels,* 183 F.3d at 333; *cf. Faragher,* 524 U.S. at 808, 118 S.Ct. 2275 (supervisors had "virtually unchecked authority over subordinates," directly controlling their activities, and victim was isolated from higher management). It is also undisputed that plaintiff had easy access to higher management authority both on-site (Ms. Melton) and off-site (Ms. Harris).

In the absence of such substantial authority by the harasser over the victim, and, where, as here, the level of authority a harasser has over a victim is ambiguous, the Fourth Circuit has assumed, without deciding, that "lesser forms derived from the agency relation may aid particular acts of supervisor harassment." *Mikels,* 183 F.3d at 333. In those circumstances, however, the court must more closely scrutinize the circumstances and the victim's

---

4. On the other hand, as discussed below, the court concludes that plaintiff may be able to establish at trial that she was terminated in retaliation for her complaints of sexual harassment.

response may be the "highly probative." Indeed, the victim's response may be the "tip off" on the issue of whether the harasser's agency authority actually aided his conduct by increasing the victim's "sense of vulnerability and defenselessness." *Id.* at 333–34. For example, "[d]oes she feel free to 'walk away and tell the offender where to go,' or does she suffer the insufferable longer than she otherwise might?" *Id.*

■ In this case, plaintiff's response to Mr. Amos' conduct demonstrates that she did not have "any sense of special vulnerability or defenseless deriving from whatever authority" Mr. Amos possessed. *Id.* at 334. When Mr. Amos followed plaintiff into the women's restroom, plaintiff told him: "[Y]ou know I'm going to report this, I swear to God, I'm going to report this" and then reported Mr. Amos the next day. (Paper No. 37, Exh. 4 at 92, 97). This is hardly the reaction of one "reluctant to accept the risks of blowing the whistle on a superior." *Mikels,* 183 F.3d at 334. There is no indication that plaintiff was reluctant in any way to report Mr. Amos. That conclusion is further supported by the minimal amount of time that passed between September 22, 1997, when plaintiff began working at Elder Health, and late October-early November 1997, when she first complained of Mr. Amos' conduct to Janice Melton. (Paper No. 38, Exh. 1 at 3). In other words, plaintiff does not appear to have suffered "the insufferable longer than she otherwise might."

In sum, the evidence establishes that plaintiff's reaction to Mr. Amos' alleged harassment is more "naturally the conduct of one who thinks of her harasser as merely a fellow employee from whose unwelcome conduct she is free to walk away or whom she can 'tell where to go.'" *Mikels,* 183 F.3d at 334. Therefore, the court concludes that there is insufficient evidence to establish that the alleged harassment was aided by the agency relation.

#### 4. *Elder Health's Affirmative Defense*

■ Even if there were evidence that the alleged harassment was aided by the agency relation, defendant would prevail on its motion for summary judgment because it can establish the affirmative defense recognized in *Faragher* and *Ellerth,* which is available where the harassment is aided by the agency relation but does not culminate in tangible employment action. There are two elements an employer must establish: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

■ With respect to the first element, the court finds that Elder Health's exercised reasonable care to prevent and remedy the allegedly harassing behavior as a matter of law. First, as to preventive measures taken by defendant, Elder Health maintained sexual harassment and "open door" policies, and notified its employees of the policies upon hiring. (Paper No. 37, Exh. 5); *First Union,* 202 F.3d at 244 ("An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent any sexually harassing behavior.").

Clearly, plaintiff availed herself of Elder Health's policy. As soon as plaintiff advised her supervisors of Mr. Amos' conduct, a prompt investigation of the complaint was conducted, including interviews with plaintiff, Mr. Amos, and two other individuals. (Paper No. 37, Exh. 10 at 58; Paper No. 38 at Exh. 13; Paper No. 45 at Exh. 2). Following the investigation, Ms. Harris issued a formal reprimand to Mr. Amos. (Paper No. 38, Exh. 13). Finally, and most importantly, the parties agree that Mr. Amos ceased his alleged sexual

misconduct following his reprimand.[5] *Cf. Brown v. Perry*, 184 F.3d 388, 396 (4th Cir.1999) (holding that employer's policy must be "both reasonably designed and reasonably effectual"). Based upon these facts, the court concludes that Elder Health's remedial response was sufficient as a matter of law.

Defendant argues that establishing the first element of the defense should suffice to satisfy the second element as well, that is, that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. In fact, the Fourth Circuit recently recognized in an unpublished opinion that, where an employer satisfies the first element of the affirmative defense and adequately responds to a report of harassment, the employer should not be held liable for the harassment on the "basis of an inability to satisfy the literal terms of the second element of the affirmative defense."[6] *Watkins v. Professional Security Bureau, Ltd.*, No. 98–2555, 1999 WL 1032614, at *5 n. 16 (4th Cir. Nov. 15, 1999), *cert. denied*, 529 U.S. 1108, 120 S.Ct. 1961, 146 L.Ed.2d 793 (2000). The court noted that a literal application of the second element of the affirmative defense "would be wholly contrary to a laudable purpose behind limitations on employer liability identified by the Supreme Court in *Burlington Industries:* to promote conciliation." *Id.* at *5 n. 16; *see also Constance Chaix Indest v. Freeman Decorating, Inc. et al.*, 164 F.3d 258, 265–66 (5th Cir.1999) (requiring second element would be tantamount to strict liability where employee quickly resorted to grievance policy and employer took prompt remedial action); *Spicer*, 66 F.3d at 710 (liability where harassment ended would be tantamount to strict liability).

The court agrees that the second element does not have any practical application where, as here, the employee promptly brought charges against the harasser, the employer took prompt remedial action, and the sexual harassment stopped. Therefore, the court concludes that Elder Health is not required to establish the second element of the affirmative defense in order to validly invoke the defense. Having established its prompt and adequate remedial response, Elder Health has established the affirmative defense as a matter of law.

Therefore, even if plaintiff could establish that Mr. Amos' conduct was aided by the agency relationship, summary judgment for Elder Health would be appropriate. Accordingly, summary judgment for Elder Health is granted on plaintiff's claim that she was subjected to hostile environment sexual harassment.

### B. *Retaliation Claim*

Plaintiff also claims that Elder Health retaliated against her by firing her for complaining about sexual harassment by Mr. Amos. (Paper No. 2 at ¶ 19; Paper No. 38 at 15).

Title VII makes it unlawful for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

---

5. Plaintiff argues that Elder Health should have punished Mr. Amos more severely despite the fact that the harassment ended. (Paper No. 38 at 14). The Fourth Circuit, however, has declined to require employers to adopt specific remedial responses, particularly where their actions are shown to be effective in ending the harassment. *Mikels*, 183 F.3d at 330; *Spicer*, 66 F.3d at 710.

6. Both *Faragher* and *Burlington* involved employees who delayed in bringing charges against their employers, *Faragher*, 524 U.S. at 782–83, 118 S.Ct. 2275; *Burlington*, 524 U.S. at 748–49, 118 S.Ct. 2257. In that context, the second element of the affirmative defense makes sense.

subchapter." 42 U.S.C. § 2000e–3(a) (1994).

The burden-shifting framework set forth in *McDonnell Douglas* applies to the analysis of retaliation claims. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir.1998) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under this framework, a plaintiff must first prove a prima facie claim of retaliation by establishing that (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) that the two are causally connected. *Id.* "[T]he prima facie case is not a difficult requirement to satisfy." *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc. et al.*, 160 F.3d 177, 181 (4th Cir.1998); *accord Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989) (recognizing "less onerous burden of making a prima facie case of causality").

The employer may rebut plaintiff's prima facie case by showing that it had a legitimate, non-discriminatory reason for the adverse action. *Laughlin*, 149 F.3d at 258. The employer need not prove the absence of a retaliatory motive; the employer need only raise a genuine issue of fact as to whether retaliation for the protected activity occurred. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985).

If the employer produces a legitimate non-retaliatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual. *Laughlin*, 149 F.3d at 258. At that point, the plaintiff must demonstrate that engaging in the protected activity was the "motivating part" in the employer's adverse action against the plaintiff. *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244, 109 S.Ct. 1775, 104 L.Ed.2d

268 (1989)). To defeat summary judgment, the employee need only "forecast" sufficient evidence of pretext to create a genuine dispute of material fact. *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993).

### 1. *Prima Facie Case*

Here, the first element of plaintiff's prima facie case is clearly met by proof that she complained about Mr. Amos' alleged sexual harassment[7] and the second element is established by virtue of the fact that plaintiff was subsequently terminated. Therefore, the only remaining issue to be decided regarding plaintiff's prima facie case is whether there is a causal connection between plaintiff's complaints of sexual harassment and her termination.

While causation depends largely on the particular facts and circumstances of a case, factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees. *E.g., Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000) (recognizing relevance of listed factors); *see also Williams*, 871 F.2d at 457 (recognizing temporal proximity as important factor). Indeed, temporal proximity and "ongoing antagonism" may be a sufficient basis for the causal link. *Farrell*, 206 F.3d at 280.

In this case, plaintiff's evidence of temporal proximity, intervening retaliatory conduct or "ongoing antagonism" and motive, coupled with circumstances leading up to plaintiff's termination, is sufficient to raise a genuine issue of material fact on the causation element. As to temporal proximity, Elder Health fired plaintiff less than three months after her sexual harassment complaint and eight weeks after Mr.

---

7. *See Thomas v. BET Soundstage Restaurant, et al.*, 104 F.Supp.2d 558, 563 (D.Md.2000) ("Thomas engaged in a protected activity— the reporting of sexual harassment to her superiors.").

Amos was reprimanded. (Paper No. 37, Exh. 3, Exh. 9 at 3, Exh. 13). Regarding intervening retaliatory conduct or, in this case, "ongoing antagonism,"[8] plaintiff alleges that Mr. Amos unfairly criticized her performance on three occasions between the time of Mr. Amos' reprimand and plaintiff's termination. (*Id.*, Exh. 9 at 3–4).[9]

Also significant in establishing a causal connection are the events of January 21, 1998 which led up to plaintiff's firing. According to plaintiff, (1) after she advised Mr. Amos that she was leaving, Mr. Amos yelled and cursed at her; (2) she told Mr. Amos twice in advance of the January 21 meeting that she had a childcare conflict and could not stay late; and (3) in telling plaintiff to stay, Mr. Amos did not mention the mandatory nature of the meeting but discussed only his efforts to arrange food, how "the company did not give a shit about [the drivers]," and how Mr. Amos wanted plaintiff to give him a ride home that evening.[10] (Paper No. 38, Exh. 2 at 180–85). Mr. Amos, on the other hand, reported that: (1) "[he] would not argue with [plain-

tiff];" (2) he reminded plaintiff that she knew of the meeting in advance but that she did not give advance notice of her conflict; and (3) he told plaintiff that she "needed to stay for the training, and that it was mandatory for all of transportation." (Paper No. 38, Exh. 8; Paper No. 45 at 174).

■ Because of the stark differences between Mr. Amos' and plaintiff's version of events, a factual dispute exists as to whether the reason Mr. Amos reported plaintiff to Ms. Harris was guided by retaliatory animus. This conclusion is particularly compelled when these facts are considered in light of the complete lack of recollection of Ms. Harris, the official who terminated plaintiff but cannot recall why. In conjunction with Mr. Amos' obvious motive to retaliate, this evidence supports a causal connection between plaintiff's complaint and termination.[11]

Notwithstanding these facts, Elder Health argues that the two events cannot be causally connected because Mr. Amos was not involved in the decision to termi-

---

8. *Farrell,* 206 F.3d at 280. While ongoing antagonism by itself does not amount to an adverse employment action, this conduct is clearly relevant to whether a causal connection exists between plaintiff's complaint and her firing. *Id.*

9. Plaintiff claims that she complained to Ms. Melton that Mr. Amos was retaliating against her, but that Ms. Melton "indicated there was nothing she could do without some proof." (Paper No. 37, Exh. 9 at 4).

10. These statements are relevant to whether the employer gave inconsistent reasons for plaintiff's firing. *See Farrell,* 206 F.3d at 279–281. While these statements clearly were not made in the context of terminating plaintiff, they are persuasive indicators, if accepted by the jury, that Mr. Amos' was motivated by personal, and perhaps, retaliatory factors in reporting plaintiff to Ms. Harris, not by a concern that plaintiff was missing part of an important safety meeting.

11. In addition to the above evidence of causal connection, plaintiff also argues that she was treated differently from other employees who

she claims were late to, or possibly absent from, the January 21 meeting but were not terminated. Plaintiff presents no admissible evidence supporting this claim. While there is some evidence that some employees may have been late or absent, there is nothing in the record reflecting why or whether Elder Health disciplined these employees. Thus, a trier of fact could only speculate that Elder Health treated plaintiff less favorably. *See Gibson,* 160 F.3d at 181 (court "must not slip into 'sheer speculation'"). At this stage of the proceedings, the court cannot accord any probative weight to plaintiff's claim of differential treatment because plaintiff has not provided any admissible evidence of such treatment. *Cf. Miskin v. Baxter Healthcare Corp. et al.,* 107 F.Supp.2d 669, 674 (D.Md.1999) (recognizing need for evidentiary foundation at summary judgment stage), *aff'd,* 213 F.3d 632, 2000 WL 517518 (4th Cir.2000). However, the fact that Mr. Amos does not recall doing any follow up, as was apparently contemplated, to determine whether some people were late or did not attend this important, mandatory meeting, (Paper No. 45 at 187–89), is arguably relevant to evaluating whether the reason for terminating plaintiff was a pretext.

nate plaintiff. (Paper No. 39 at 3–5). Plaintiff's theory is that, while Mr. Amos did not actually terminate plaintiff, that he "substantially influenced" Ms. Harris' decision to terminate plaintiff by his actions which were motivated by retaliatory animus.[12]

Contrary to defendant's assertions, the inquiry does not end with the bare allegation that Mr. Amos was not involved in the decision to terminate plaintiff. This is not a situation where the alleged harasser was far removed from the termination process. *See e.g., Johnson v. West,* 218 F.3d 725, 731 (7th Cir.2000) (supervisor and employee separated between complaint and firing); *Childress v. Petsmart, Inc.,* 104 F.Supp.2d 705, 708 (W.D.Tex.2000) (supervisor suspended between complaint and firing).

Clearly, a sufficient causal connection would exist if the jury concluded that Mr. Amos, in fact, did substantially influence Ms. Harris' decision to terminate plaintiff. *See Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) (holding employer liable where impartial committee acted as supervisor's "cat's-paw" in deciding to fire employee); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1565 (11th Cir.1987) (finding sufficient evidence to create jury question as to "whether [supervisor] influenced [superior] to fire [plaintiff] in retaliation for [plaintiff's] reaction to his unwelcome advances"); *Miller v. Bank of America,* 600 F.2d 211, (9th Cir.1979) (recognizing liability may attach where supervisor is "authorized to hire, fire, discipline or promote, or *at least to participate in or recommend such actions*") (emphasis added); *Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 823 (S.D.Ga.1988) (finding prima facie proof of quid pro quo harassment where supervisor, "although not the ultimate decision maker, had a great amount of influence"); *Schroeder v. Schock et al.,* No. 85–1710–K, 42 F.E.P. Cases 1112, 1986 WL 15483, at *3 (D.Kan. Dec. 29, 1986) (finding liability where supervisor "had considerable input into his employer's ultimate decision to fire employees").

In this case, the court concludes that there is a factual dispute as to whether Mr. Amos substantially influenced Ms. Harris' decision to terminate plaintiff. The only testimony supporting Elder Health's theory that Mr. Amos had nothing to do with the decision to terminate is Mr. Amos' testimony. (Paper No. 45 at 185). While defendant argues that Ms. Harris supports that conclusion, an exami-

---

**12.** At the hearing, plaintiff also asserted that Mr. Amos acted to retaliate against plaintiff for her failure to comply with his sexual demands. There is a split of authority on whether a mere rebuff can, without more, constitute a "protected activity." *Compare Yancey v. Nat'l Center on Institutions and Alternatives,* 986 F.Supp. 945, 955 n. 14 (D.Md.1997) ("Yancey seems to allege that Johnson retaliated against her by 'writing her up' after she refused his sexual advances. This is not an appropriate retaliation claim. At the time that Yancey was 'written up' by Johnson, she had engaged in *no protected activity* for which Johnson could allegedly have been retaliating against her.") (emphasis added), *aff'd,* 141 F.3d 1162, 1998 WL 196733 (4th Cir.1998) and *Baker v. Starwood Hotel and Resort Worldwide, Inc. et al.,* No. Civ.A. 98–2076, 80 F.E.P. Cases 1114, 1999 WL 397405, at *5 (E.D.La. June 15, 1999) (doubting that "mere rebuff ... constitutes opposition activity"), *with Robinson v. Pinna-*

cle Brands, Inc., No. 3–95–CV–0689–R, 1997 WL 102478, at *8 (N.D.Tex. Feb. 28, 1997) ("Also protected were [plaintiff's] direct rebuffs of her supervisor's sexual harassment."); *see also Glover v. South Carolina Law Enforcement Div.,* 170 F.3d 411, 415 (4th Cir.1999) (observing that Fourth Circuit applies balancing test "to distinguish between protected opposition and unprotected obstreperousness"), *cert. dismissed,* 528 U.S. 1146, 120 S.Ct. 1005, 145 L.Ed.2d 1065 (2000).

The court need not decide this question here because, as discussed in greater detail above, the reporting by plaintiff of the alleged misconduct serves to break the causal connection between the harassment and firing. Therefore, there is no factual basis for plaintiff's claim that she was terminated for her failure to comply with her sexual demands. Rather, the appropriate focus of the retaliation analysis should be on the connection between plaintiff's complaint about Mr. Amos and her termination.

nation of Ms. Harris' deposition testimony clearly reveals that it is, at best, equivocal and, at worst, evasive.

Ms. Harris recalls absolutely nothing about what Mr. Amos told her or why she terminated plaintiff, other than perhaps for the reasons set forth in the disciplinary form prepared by Mr. Amos. (Paper No. 44 at 111–120). At a minimum, it appears that Ms. Harris adopted Mr. Amos' version of the January 21 meeting without any independent investigation whatsoever. She did not interview plaintiff; nor did she explore the attendance status of any other employees to this "mandatory" meeting. She did not know if others left early, arrived late or did not attend at all. Moreover, contrary to defendant's assertions, the record does not support the conclusion that Mr. Amos would not have the opportunity to provide his input into the decision to terminate plaintiff. On this point, Ms. Harris merely testified that Mr. Amos "would not" be involved in the decision to terminate. A review of that testimony clearly reveals that her answer appears to be more of a hypothetical nature than what actually happened in relation to plaintiff's termination.[13] In addition, of particular significance is the open question of whether Mr. Amos checked the block on the disciplinary form recommending termination.[14]

For the reasons stated above, the evidence of temporal proximity, ongoing antagonism, and motive together with the circumstances leading up to and surrounding plaintiff's termination, including Mr. Amos' involvement in that process, raises sufficient issues of material fact as to causation to preclude summary judgment.

## 2. Defendant's Legitimate, Non-discriminatory Reason

Even where a plaintiff establishes a prima facie case, an employer may rebut the prima facie case by showing that it had a legitimate, nondiscriminatory reason for the adverse action. *Laughlin,* 149 F.3d at 258. Here, Elder Health's claims that its legitimate, nondiscriminatory reason for terminating plaintiff was because she "left a training session without permission." (Paper No. 37 at 21).

In support of its position, Elder Health argues that plaintiff's termination is consistent with Elder Health's strict employee conduct policies which "warn that failure or refusal to carry out work orders or early departure from work may 'result in immediate disciplinary action, up to and including termination of employment.'" (Paper No. 37 at 9). Elder Health claims that it terminated two van drivers on January 20, 1998, the day before plaintiff's termination, for the same conduct.[15] (*Id.*). The court is not persuaded by this argument because the other two firings were not for the "same conduct" as allegedly committed by plaintiff.[16] In addition,

13. In addition to Ms. Harris' testimony, Holly Santos, the human resources director after Ms. Harris, testified that, during her tenure, Mr. Amos participated in driver discipline, including decisions to terminate. (Paper No. 38, Exh. 5 at 14–15). Ms. Melton also testified that Mr. Amos participated in driver discipline. (*Id.,* Exh. 3 at 16–21). This discrepancy regarding Mr. Amos' authority raises a factual issue regarding the scope of his authority to participate in, or substantially influence, the termination process.

14. The disciplinary action form contains a checked box indicating "recommendation for discharge," yet it remains unclear who checked the box. Ms. Harris testified that all the writing on the form was Mr. Amos' "[e]x-

cept for my signature." (Paper No. 44 at 113).

15. Elder Health appears to offer this evidence both to support the legitimate, non-discriminatory nature of its proffered reason for terminating plaintiff as well as to rebut plaintiff's arguments that these reasons are a pretext for plaintiff's retaliatory termination.

16. The first example involved a driver who left an orientation meeting for new drivers, claiming that "she had to pick up her child from day care, but failed to give Elder Health any advance notice of this fact." (*Id.* at 10). According to plaintiff, she gave Mr. Amos advance notice of her childcare issues. Elder Health's second example is even more una-

there is no evidence suggesting the Mr. Amos had a motive to retaliate against the two other employees. Nonetheless, Elder Health has met its burden of producing a legitimate, non-retaliatory explanation for firing plaintiff. The burden now shifts to plaintiff to rebut Elder Health's explanation with evidence of pretext.

### 3. Evidence of Pretext

■ Where, as here, the employer produces a legitimate, non-retaliatory reason for the termination, the plaintiff bears the burden of offering evidence that the proferred reason is pretextual. *Laughlin,* 149 F.3d at 258. As recently noted by the Supreme Court, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000); *see also Rowe v. Marley Co.,* 233 F.3d 825, 829 (4th Cir.2000) (plaintiff may establish pretext "by showing that the employer's proffered explanation is unworthy of credence"). While evidence of a false explanation may not suffice in every case without further proof of discrimination or retaliation, a plaintiff is no longer required to provide evidence of "pretext plus" evidence of discrimination or retaliation. *Rowe,* 233 F.3d at 830.

■ In this case, the court finds the plaintiff's prima facie case combined with other evidence that Elder Health's asserted justification is false, is sufficient evidence of pretext to create a genuine issue of material fact. The following evidence regarding plaintiff's prima facie case is also pertinent to plaintiff's allegations of

pretext: 1) the temporal proximity between plaintiff's complaint and the resulting reprimand of Mr. Amos and plaintiff's termination; 2) the alleged ongoing antagonism between Mr. Amos and plaintiff; 3) Mr. Amos' motive to retaliate; and 4) the events leading up to, and surrounding, plaintiff's termination.

Credibility issues surround much of this evidence. Those issues, in the court's view, present an insurmountable hurdle to finding that plaintiff has failed to establish pretext as a matter of law. Plaintiff and Mr. Amos offer very different versions of the events giving rise to plaintiff's termination.

At a minimum, Mr. Amos' credibility bears on several issues of note including his motivations in reporting plaintiff, what he told Ms. Harris, and whether he overtly or implicitly influenced the firing process. Mr. Amos' credibility is particularly important in assessing pretext in light of Ms. Harris' complete lack of recollection of the precise circumstances surrounding plaintiff's firing. While Ms. Harris testified that Mr. Amos "would not" recommend termination, she could not recall what Mr. Amos told her during their January 21 conversation. (Paper No. 44 at 110, 117). Ms. Harris also could not recall telling Mr. Amos that plaintiff was terminated. (*Id.* at 117). Indeed, Ms. Harris could not recall anything that "led up to [her] terminating or firing Barbara Jaudon." (*Id.* at 111). The court cannot conclude, as Elder Health apparently urges, that these facts are not relevant to an assessment of whether defendant's reason for firing plaintiff is pretextual.[17]

In addition to the evidence pertaining to plaintiff's prima facie case, there is other

---

vailing. There, a van driver refused to drive a member home, dropped off the keys to her van, and walked off the job. (*Id.*).

**17.** It bears noting that the parties did not originally offer substantial portions of Ms. Harris' or Mr. Amos' depositions. The complete transcripts were provided at the court's

request. Based on a review of the transcript of Ms. Harris' deposition, it is difficult to imagine how Elder Health can rely on her testimony to establish anything as a matter of law. Ms. Harris has absolutely no independent recollection of why she fired plaintiff. (Paper No. 44 at 111–120).

evidence of record supporting the conclusion that Elder Health's asserted justification is false. It is undisputed that there was a complete lack of "process" preceding plaintiff's firing. In fact, there is absolutely no evidence that Ms. Harris undertook any independent factual investigation regarding the events of January 21. She apparently relied solely on what she was told by Mr. Amos; she never contacted plaintiff in advance of the firing to learn her account of the events.[18] (Paper No. 37, Exh. 2 at 185). *Cf. American Postal Workers Union et al. v. U.S. Postal Service,* 830 F.2d 294, 311 (D.C.Cir.1987) (finding pretext to violate First Amendment rights where Post Office fired employee "on the spot without investigating further to determine whether [regulatory] violation in fact occurred"); *see also Gooden v. Neal et al.,* 17 F.3d 925, 933 (7th Cir.1994) (following *American Postal Workers* in Title VII case).

While a court cannot direct what "process" should be employed under these circumstance, the lack of process is certainly relevant to an evaluation of pretext. A jury may find the lack of process preceding the imposition of the ultimate form of discipline upon plaintiff to be persuasive evidence of pretext, particularly in view of Ms. Harris' thorough investigation of plaintiff's allegations of sexual harassment which culminated in a mere reprimand of Mr. Amos. This is especially so because the magnitude of plaintiff's transgression in leaving the meeting early is in question given plaintiff's testimony that the meeting started fifteen minutes late, several drivers allegedly arrived shortly before the presentation ended, and that when plaintiff left the building between 5:25 and 5:30 p.m., the speaker was "wrapping up" his presentation. (Paper No. 38, Exh. 2 at 184, 188–90).

Of additional import to the pretext determination is the fact that plaintiff apparently had no disciplinary record prior to her termination. *Street v. Coin Wrap, Inc.,* No. CCB–99–1654, 2000 WL 964772, at *7 (D.Md. June 22, 2000) (finding sufficient evidence of pretext where employee "was fired for leaving work without permission" even though he "had never received a warning or criticism on his performance"). The jury could find sufficient evidence of pretext where plaintiff was fired for leaving a meeting that was almost over when she had never before been disciplined.

■ Elder Health urges the court not to examine its decision to terminate plaintiff but to merely accept its articulated non-retaliatory reason for firing plaintiff. The court is mindful that "[w]ithout evidence of pretext for retaliation," the court should not "act as a super-personnel department that reexamines an entity's business decision." *Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997) (quoting authority). Where, as in this case, there is evidence of pretext, a factfinder must be permitted to examine the facts and circumstances of a firing in determining whether the articulated reason for the firing is a pretext for unlawful retaliation. This is particularly important here because Ms. Harris, who Elder Health claims was the sole decision maker, has no recollection of why she made the decision she did and the only documentation of her decision is the disciplinary form created by Mr. Amos. The question of why plaintiff was terminated must be decided by the jury.

In sum, there are genuine issues of material fact regarding whether Elder Health's reasons for plaintiff's termination are pretextual which preclude summary

---

18. At the hearing on the pending motion, defendant argued, and plaintiff appeared to agree, that plaintiff's retaliation theory is that Ms. Harris was an unwitting "dupe" of Mr. Amos. At this stage of the proceedings and on the record currently before the court (including the extraordinary lack of recollection by Ms. Harris), the court cannot conclude whether Ms. Harris was an unwitting or knowing participant in a retaliatory termination of plaintiff.

judgment for Elder Health. The fact that summary judgment is not appropriate is by no means an indication that plaintiff's case is compelling or that she will prevail at trial but only that the ultimate resolution of her case must be made by the jury.

## C. *Punitive Damages*

Plaintiff seeks punitive damages on her Title VII counts. (Paper No. 2 at Counts I & II). Defendant seeks summary judgment on the punitive damages claim. (Paper No. 37 at 24).

▆ Punitive damages are available in Title VII cases only "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (1994). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not it awareness that it is engaging in discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

▆ In order to hold an employer vicariously liable for a punitive damage award for the intentionally discriminatory conduct of its employee, there must be sufficient evidence to establish that the "employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply with Title VII." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442 (4th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000). For the reasons stated below, summary judgment for Elder Health will be granted on plaintiff's punitive damages claim.

First, as to the requirement that the employer know that his conduct is in violation of federal law, the court concludes that there is sufficient evidence to establish this element. The only violation of Title VII remaining in this case is retaliatory discharge. If proven, this underlying theory of discrimination is not "novel or otherwise poorly recognized." *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118.[19]

In addition, it is undisputed that Elder Health published and maintained sexual harassment, open door, and equal opportunity policies in its employee handbook. (Paper No. 37, Exh. 5). Further, it posted Title VII notices in all employee break rooms advising that discrimination on the basis of gender is illegal under federal law. (Paper No. 37 at 4 and Exh. 6). With such information widely accessible, a jury could reasonably conclude that Mr. Amos and Ms. Harris knew that retaliatory termination was a violation of federal law.

For Elder Health to be held vicariously liable for punitive damages in this case, there must be sufficient evidence that Mr. Amos or Ms. Harris: 1) served in a managerial capacity and 2) acted within the scope of employment when plaintiff was fired. There is sufficient evidence of these factors. As to the first element, while Mr. Amos' precise level of authority is contested, he clearly had some level of supervisory authority over plaintiff. As discussed above, there is evidence in the record that Mr. Amos supervised the drivers at his facility, which included such managerial tasks as scheduling work, reporting misconduct, carrying out discipline, training, testing, and making hiring recommendations. At a minimum, there are factual issues as to whether Mr. Amos could recommend termination. (Paper No. 37, Exh. 2; Paper No. 38, Exh. 3 at 20–21, Exh. 5 at 15; Paper No. 44 at 24, 113–114).

**19.** Indeed, Ms. Harris apparently recognized the potential legal problem when she cautioned Mr. Amos in connection with plaintiff's sexual harassment complaint "not to say anything or do anything or act differently towards Barbara" because "it would appear that [he was] picking." (Paper No. 45 at 141–42, 157).

From these facts, a jury could conclude that Mr. Amos was acting in a managerial capacity when he "substantially influenced" Ms. Harris' decision to terminate plaintiff. *Cf. Equal Employment Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir.1999) (manager could discipline employees and make hiring and firing recommendations). As to Ms. Harris' managerial authority, there does not appear to be any dispute; it is apparent that she had the sole discretion to terminate plaintiff.

■ As to the second element, the court concludes that there is sufficient evidence from which a jury could conclude that Mr. Amos and Ms. Harris acted within the scope of their authority when they terminated plaintiff. The applicable test is whether the conduct at issue is the kind the individual involved was "employed to perform, occurred substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer." *Lowery*, 206 F.3d at 444. Here, this test is satisfied with respect to both Mr. Amos and Ms. Harris. As to Mr. Amos, part of his job generally was to report misconduct and, specifically, as to plaintiff, he had been explicitly instructed by Ms. Harris to report any problems with plaintiff to Ms. Harris. As to Ms. Harris, there again appears to be no issue that part of her job was to terminate employees. Both Mr. Amos and Ms. Harris acted during working hours on company property. Finally, the evidence supports an inference that plaintiff was terminated, at least in part, for the purpose of serving Elder Health. *See Kolstad*, 527 U.S. at 544, 119 S.Ct. 2118 (recognizing "an employee may be said to act within the scope of employment even if the employee engages in acts 'specifically forbidden' by the employer and uses 'forbidden means of accomplishing results' ").

Recognizing that strict application of the Restatement of Agency rules on the "scope of employment" might create "perverse incentives" to compliance with Title VII, the Supreme Court in *Kolstad* held that, in the punitive damages context, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. 2118. The *Kolstad* court recognized the reason for this requirement, in part, was because Title VII was "an effort to promote prevention as well as remediation" and that "giving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of 'motivat[ing] employers to detect and deter Title VII violations.'" *Id.* at 545–46, 119 S.Ct. 2118 (quotation omitted).

■ In this case, the record clearly establishes that Elder Health published, maintained, and distributed sexual harassment, open door, and equal opportunity policies. (Paper No. 37 at Exh. 5). Indeed, Elder Health's good faith efforts to maintain such a policy are exhibited by the ease with which plaintiff was able to report the alleged sexual harassment by Mr. Amos against her. Whether one agrees with the way Ms. Harris handled that complaint or not, it is clear that Elder Health made good faith efforts to have a reasonable complaint procedure in place. Indeed, by plaintiff's admission, the harassment by Mr. Amos ended after she reported his conduct to Ms. Harris. In the face of this substantial evidence, plaintiff has not offered any evidence to establish that Elder Health did not engage in good faith efforts to comply with Title VII.[20]

20. This is not a case where plaintiff has alleged that Elder Health's procedures were a mere facade or "mask" designed to hide a corporate policy of discrimination. *Cf. Lowery*, 206 F.3d at 446 (jury could conclude that policy was a mask to a discriminatory policy where company had subjective and unstructured promotional system and company executives responsible for system had demonstrated racial animus against African Americans).

In sum, the court concludes that, while a jury might reasonably find that Mr. Amos and Ms. Harris committed intentional discrimination while acting in a managerial capacity within the scope of their employment, there is no evidence that Elder Health did not engage in "good faith efforts to comply with Title VII." Accordingly, summary judgment for Elder Health on plaintiff's punitive damages claim is appropriate.

### IV. *Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. A separate order shall issue.

### *ORDER*

For the foregoing reasons, IT IS this 19th day of December, 2000 HEREBY ORDERED that:

1. Defendants' Motion for Summary Judgment is DENIED with respect to plaintiff's Title VII claim of retaliation against defendant Elder Health;

2. Defendants' Motion for Summary Judgment is GRANTED with respect to all remaining claims against Elder Health and Regi Amos; and

3. The Clerk of the Court shall mail a copy of this Order with the accompanying Memorandum to counsel of record.